IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Oyenike Alaka : CIVIL ACTION
:
v. : 02-CV-4664
:
Elwood, et al. :

**MEMORANDUM AND ORDER**

**Anita B. Brody, J.**                                                              **October    , 2002**

On July 15, 2002, Oyenike Alaka ("Alaka") filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. §2241, challenging her continued detention by the Immigration and

Naturalization Service ("INS") pending removal proceedings.  I will grant the petition.

**I.      Procedural History**

Petitioner, Oyenike Alaka ("Alaka"), a native of Nigeria, is a thirty-eight year-old lawful

permanent resident of the United States.  She first entered this country without inspection in

November 1984.[1]  She became a temporary resident on November 28, 1988.[2]  She was granted

---

[1]Aliens seeking admission into the United States must be inspected (interviewed) by the
INS at a port of entry (land border, airport, seaport).  Alaka entered the United States illegally.
She crossed the border near Buffalo, New York without a visa and later filed an application to
adjust her status to that of a temporary resident employed as a special agricultural worker.

[2]The Immigration Reform and Control Act (IRCA) of 1986, Pub. L. No. 99-603, 100 Stat.
3359, codified at 8 U.S.C. §1255a(a), granted legalization to persons who were undocumented
aliens or status violators in the United States.  Aliens were legalized through a two-step process;
the first step was making an application for and receiving lawful temporary residence, 8 U.S.C
§1255a(a), the second step was adjustment to lawful permanent residence.  8 U.S.C. §1255a(a).

amnesty and became a permanent resident on December 1, 1990.  From the time of her initial

entry into the United States in 1984, until she became a lawful permanent resident in 1990, Alaka

did not leave the United States.  Subsequent to becoming a lawful permanent resident in 1990,

Alaka has left the United States nine times.[3]

On June 5, 1992, Alaka pled guilty and was convicted in the United States District Court

for the District of Minnesota of aiding and abetting bank fraud under 18 U.S.C. §1344. She was

sentenced to eight months in prison, followed by three months of supervised release, and ordered

to pay restitution in the amount of $4,716.68.

On August 8, 2001, Alaka returned to the United States after spending eight months in

_____

| | |
|---|---|
| [3]December 1990 - February 1991 | Alaka left to visit family in Nigeria. |
| January 1994 - October 1995 | Alaka left to visit family in Nigeria for one month. Upon her return, while in transit in France, she was arrested and convicted for possessing cocaine in her luggage and was imprisoned from February 1994 until August 1995.  When released, she returned to Nigeria before re-entering the United States. |
| June 1997 - August 1997 | Alaka visited family in Nigeria. |
| November 1997 | Alaka made a short visit to friends in Canada. |
| February 1998 | Alaka made a second short visit to friends in Canada. |
| March or April 1998 | Alaka made a third visit to friends in Canada. |
| May 1998-August 1998 | She entered Canada for a short visit, but was arrested and convicted of bank fraud. She was given a three-month sentence and remained in Canada until August 1998. |
| January 1999-March 1999 | Alaka spent three months with friends in Canada. |
| January 2001 - August 2001 | In January, 2001, Alaka again traveled to Nigeria where she was married on March 1, 2001. |

Nigeria. She applied for admission into the country as a returning lawful permanent resident.

INS officials apprehended and detained Alaka at John F. Kennedy Airport when they discovered

that she had an outstanding federal warrant for a probation violation relating to her 1992 criminal

conviction.[4] Alaka was transferred to a detention facility in York, Pennsylvania where she has

remained for almost fourteen months. Although the charged probation violation was later

dismissed, the INS continued to detain Alaka because of her criminal history, asserting that her

criminal conviction made her removable from the United States.[5]

On November 19, 2001, the INS issued a Notice to Appear,[6] advising Alaka that she was

---

[4]Alaka remained in Nigeria longer than the amount of time approved by her probation officer prior to her departure. She extended her stay because of her brother's unexpected death and was unable to contact her probation officer. The charged probation violation was later dismissed.

[5]The INS cited two criminal convictions. Alaka admitted to three convictions: one in the United States, one in France and one in Canada. Her French conviction had not been recorded by the INS.

In February 1994, Alaka was returning to the United States from Nigeria. While transiting through France, Alaka was arrested and later pled guilty to possession of cocaine. There is no record of a conviction in this matter. She received a three-year sentence of which she served one-and-a-half years. Alaka alleges she was detained for eleven months without the opportunity to speak with counsel. Her sentence was shortened when she agreed to depart France.

After being released in France in August 1995, Alaka returned to Nigeria. While there, she allegedly informed the United States consulate in Lagos, Nigeria of her French narcotics conviction. Alaka asserts that she reported the name of the individual who had given her the cocaine to transport in order to aid any investigation and clear her own name.

On May 15, 1998, Alaka was convicted in Canada for fraud and illegal possession and use of a credit card. She received a three-month sentence for the fraud charge and concurrent thirty-day sentences for the other charges. Alaka alleges that the actual amount of credit card use was approximately $2,500 Canadian dollars.

[6]Removal proceedings are initiated with the issuance of a written "notice to appear" ( INS Form I-862). This notice is provided to the respondent, specifying the time and place where removal proceedings will be held and the legal authority under which proceedings are conducted, alleging alienage and reciting the acts or conduct alleged to be in violation of law and the charges

an "arriving alien" pursuant to section 212(a)(2)(A)(i)(I) of the Immigration and Naturalization Act ("INA"), codified at 8 U.S.C. 1182(a)(2)(A)(i)(I), based on her 1992 bank fraud conviction.[7] The Notice to Appear also charged that her conviction constituted a crime of moral turpitude within the meaning of INA §101(a)(13)(C) , codified at 8 U.S.C. §1101(a)(13)(C)(2001),[8] and rendered her ineligible for admission into and subject to removal from the United States under INA §235(b), codified at 8 U.S.C. §1225(b).[9]

On January 22, 2002, Alaka petitioned the Immigration Court requesting an independent bond hearing for release from detention pending the outcome of her INS case.[10] Alaka's petition was assigned to Immigration Judge Durling ("Judge Durling"), who held a hearing on the matter. He found that Alaka was not a flight risk nor a danger to the community. On March 12, 2002, Judge Durling issued a written opinion granting Alaka's petition and ordering her released on $2500 custody bond.[11]

---

against the respondent. The notice includes an advisal that the individual may be represented by counsel at the proceedings. See, INA § 240; 8 U.S.C. §1229.

[7]See infra note 27.

[8]See infra text accompanying notes 25-28.

[9]Although the INS was aware of Alaka's other convictions, only the 1992 conviction in the United States serves as the basis for the Notice to Appear.

[10]On January 22, 2002, Alaka also sent a letter to the INS requesting parole pursuant to 8 § C.F.R. §212.5(b), stating that she was neither a flight risk nor a danger to the community. She addressed the difficulty of her incarceration on her children from whom she is separated. The District Director denied her parole request on April 12, 2002, citing insufficient ties to the community and information in her file indicating that she was likely to engage in criminal activities that might pose a danger to the community.

[11]Immigration Judge Durling based his decision on the Third Circuit's ruling in Patel v. Zemski, finding that the court's holding was broad enough to encompass arriving aliens, such as

On March 13, 2002, the INS appealed the decision of Judge Durling to the Board of

Immigration Appeals ("the Board"), contesting Immigration Judge Durling's authority to issue

such a bond decision.[12]  The INS's appeal was coupled with a Motion to Stay the effect of the

Immigration Judge's order.  Pursuant to the automatic stay provision of 8 C.F.R. §3.19(2), Judge

Durling's order was automatically stayed pending the outcome of the INS appeal.[13]  On March

14, 2002, the Board granted the INS's motion to stay the Immigration Judge's bond decision.

On July 8, 2002, Alaka was before Judge Durling for another hearing to determine the

effect of her foreign convictions.  He held that, as a result of her foreign convictions, Alaka had

constructively abandoned her status as a permanent resident.  Although this interlocutory

determination was made, Alaka maintains her status as a lawful permanent resident until a final

decision is reached in her immigration proceedings.[14]

---

petitioner, who were lawful permanent residents.  He acknowledged that INS regulation 8 C.F.R. §3.19(h)(2)(i)(B) specifically precluded an immigration judge from reviewing the custody of an arriving alien, however, he found that the regulation could not survive the Third Circuit's decision in Patel.

[12]Alaka also appealed Immigration Judge Durling's ruling, contending that the amount of bond was too high.

[13]At the same time the INS filed its appeal, the INS also filed a Notice of INS Intent to Appeal Custody Redetermination, form EOIR-43, pursuant to 8 C.F.R. §3.19(i)(2), which has the effect of automatically staying the immigration judge's decision.  The automatic stay remains in place until the conclusion of the INS appeal.  On June 28, 2002, this court held, in Altagracia Altamonte-Vargas v. Elwood, that the use of the automatic stay to achieve effective mandatory detention exceeded constitutional limitations. 2002 WL 1471555, (E.D.Pa. June 28, 2002) (citing Patel v. Zemski, 275 F. 3d 299 (3d. 2001)).  The INS removed the automatic stay in this case by withdrawing the form EOIR-43 on July 17, 2002.

[14]See, 8 C.F.R. §1.1(p)(stating that lawful permanent resident status "terminates upon entry of a final administrative order of exclusion or deportation"); Matter of Gunaydin, 18 I & N Dec. 326 (BIA 1982), aff'd, 742 F. 2d 776 (3d. Cir. 1984); Patel v. Zemski, 275 F. 3d 299, 307(citing Matter of Mendoza -Sandino, Int. Dec. 3426 (BIA 2000))(3d. 2001).

On or about July 15, 2002, Alaka filed this petition for habeas corpus. On July 28, 2002, the Board of Immigration Appeals vacated Judge Durling's March 12, 2002 order that released Alaka on $2500 bond.[15] Finally, on August 8, 2002, a hearing was held before Immigration Judge Durling to address Alaka's withholding of removal and Convention Against Torture claims.[16]

## II.    Procedure under the Immigration and Naturalization Act

As any foreign traveler can attest, passengers arriving into the United States through an international airport terminal must pass through a United States Immigration Service checkpoint before entering the country. All incoming passengers are separated into two lines[17]: one line for

---

[15]The Board of Immigration Appeals, vacating the Immigration Judge's order, stated that neither the Board nor the immigration judge has authority to review custody determinations of arriving aliens. The BIA noted that, unlike the alien in Patel v. Zemski, Alaka is an arriving alien. 275 F. 3d 299 (3d. 2001). Because the Board found no express statement applying Patel to arriving aliens, it held that the Immigration Judge was without authority to consider Alaka's request for release from custody.

[16]Both claims are humanitarian categories under U.S. immigration law designed to protect individuals of designated countries for temporary periods. The United States may not remove an alien to a country where the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a social group, or political opinion. 8 U.S.C. §1231(b)(3). If eligibility is demonstrated, a grant of withholding of removal is mandatory, not discretionary. Article 3 of the Convention Against Torture ("CAT"), similarly requires a state party not to "expel...a person to another state where there are substantial grounds for believing that he or she would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, G.A. Res. 46, U.N. GAOR, 39th Sess., Supp. No. 51, U.N. Doc. A/51 (1984).

[17]The configuration of the INS checkpoint in the international arrivals terminal was verified by the Philadelphia International Airport Immigration Office.

citizens, nationals[18] and lawful permanent residents,[19] the second line for arriving aliens.[20]

In the first line, ordinarily, citizens, nationals and lawful permanent residents, whose credentials are in order, merely show their passports and are immediately admitted into the country without further ado. If the trip was short and the permanent resident has not committed certain proscribed acts, a lawful permanent resident alien does not have to demonstrate he or she is admissible each time he or she seeks to return after a trip outside the country. [21]

---

[18]Nationals are persons who owe permanent allegiance to the United States. There are two categories: U.S. citizen and non-U.S. citizen nationals. See, 8 U.S.C. §§1101(a)(22)(B), 1408. Persons who are nationals but not citizens of the United States are entitled to U.S. passports and the protection of U.S. diplomatic representation abroad, but are generally not eligible to vote in U.S. elections. See, U.S. Dep't of State, 7 Foreign Affairs Manual (FAM) §1111.3(b). Currently only American Samoans and Swains Islanders are nationals but not citizens of the United States. See, 7 FAM §1111.3(d).

[19]Also known as "immigrants," "LPRs," or "green card holders," lawful permanent residents may reside in the United States permanently, as long as they do not violate immigration laws. See, INA §101(a)(15; 8 U.S.C. §§1101(a)(15), 1153. Lawful permanent resident status is permanent, and may only be removed if the alien is determined to have committed a deportable offense under 8 U.S.C. §1227, or an offense making the alien inadmissible under INA §212(a), 8 U.S.C. §1182(a), or if the alien "abandons" his or her residence in the United States. Lawful permanent residents may travel abroad and be readmitted to the United States using their permanent resident cards, as long as they do not commit an act that renders them inadmissible. See, INA§101(a)(13), 212(a); 8 U.S.C. §§1101(a)(13), 1182(a).

[20]An alien who is seeking admission into the United States, who is not a lawful permanent resident, is considered an "arriving alien."

[21]An early immigration concept known as the "reentry doctrine" provided that aliens were subject to an admissibility test each time they returned to the United States from abroad, no matter how brief the absence was. See, e.g., United States ex rel. Volpe v. Smith, 289 U.S. 422(1933). Over time, an exception to the reentry doctrine's strict admissibility test was made for lawful permanent residents returning from brief trips abroad. See, Rosenberg v. Fleuti, 374 U.S. 449, 462 (1963). An amendment by the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA) of 1996, codified at 8 U.S.C. §1101(A)13), established a similar exception. Thus, under current law, when a returning lawful permanent resident presents himself or herself for re-admission at the border, he or she is not regarded as seeking admission unless one of six enumerated statutory exceptions exists. See, INA §101(a)(13)(C); 8 U.S.C.

On the other hand, in the second line, each time an arriving alien seeks to enter the United States, he or she must satisfy the INS at the airport that he or she is admissible.[22]  Arriving aliens seeking admission must be inspected (interviewed) by an INS agent.  If the arriving alien falls within a statutory category of admission[23] and is clearly admissible, the alien is permitted to enter the United States.  All other arriving aliens are at least temporarily detained in order to determine their status; that is, whether they must be immediately returned to their origin ("expedited removal") or permitted to remain in the United States pending proceedings to determine if admissible (what I will call "regular removal").

Although lawful permanent residents begin in the same line as citizens, an INS officer will treat a lawful permanent resident as an arriving alien[24], if that lawful permanent resident has

---

§1101(a)(13).

[22]Section 235(a)(1) of the INA, codified at 8 U.S.C. §1225(a)(1), provides:
(A) Inspection
        (1)Aliens treated as applicants for admission
        An alien present in the United States who has not been admitted or who arrives in
        the United States...shall be deemed for purposes of this chapter an applicant for
        admission.
8 U.S.C. §1225(a)(1).
    After the INS demonstrates that the individual is an arriving alien, the applicant seeking admission must demonstrate that he or she is "clearly and beyond a doubt entitled to be admitted into the United States and is not inadmissible as charged."  8 U.S.C. §1229(a)(c)(2)(A); 8 C.F.R. §240.8(b).  The INS has the burden of establishing inadmissibility, however, in the case of a returning permanent resident.  See, Matter of Kane, 15 I. & N. Dec. 258 (BIA 1975).

[23]In order to be admitted, an alien must be eligible for some type of temporary or permanent status in the United States.  Categories of status include: lawful permanent residents; non-immigrants, including diplomats, and visitors for business, pleasure, work or study, 8 U.S.C. §1101(a)(15); persons in humanitarian categories, including refugees and asylees, 8 U.S.C. §§1157, 1158.

[24]8 C.F.R. §235.3(5) governs the admission of lawful permanent residents. §235.3(5)(ii) provides that if an alien's claim to lawful permanent resident status is verified, "the examining immigration officer will determine in accordance with §101(13)(C) [codified at 8 U.S.C. §1101(a)(13)]  of the Act whether the alien is considered to be making an application for

committed certain proscribed acts.[25]  The lawful permanent resident is, in effect, bumped into the

arriving alien line.   At this point, the permanent resident must undergo an inspection as though

an arriving alien.  The permanent resident is then scrutinized by an Immigration Officer to

determine whether or not he or she is admissible or inadmissible in the same manner as any other

arriving alien.

If an arriving alien falls within one of the categories of "inadmissible" aliens, the arriving

alien will be deemed inadmissible.  Categories of inadmissibility include certain diseases of

"public health significance," likelihood of becoming a public charge, commission or conviction

of certain crimes, moral grounds such as prostitution, ideological grounds such as totalitarian or

Communist party membership, prior immigration violations, or terrorist activity.[26]   Most

---

admission."  8 C.F.R. §235.3(5)(iii).  See also, Matter of Collado, 21 I.& N. Dec. 1061 (BIA 1997) (under IIRIRA amendment, a lawful permanent resident who falls within the provisions of 8 USC § 1101(a)(13)(i)-(vi) is to be considered "seeking admission" for purposes of immigration laws, without further inquiry into the nature and circumstances of the alien's departure and return); 8 U.S.C. §1101(a)(13).

[25] INA §101(a)(13)(C) provides that a returning lawful permanent resident will not be deemed to be seeking admission unless he or she:
  (1) has abandoned or relinquished her status as a lawful permanent resident
  (2) has been absent from the United States for a continuous period in excess of 180 days
  (3) has engaged in illegal activity after having departed the United States
  (4) has left the United States after having been placed in proceedings seeking her removal from the United States, including removal and extradition proceedings
  (5) **has committed an offense identified in § 212(a)(2)**(relating to the criminal grounds for inadmissibility) unless the alien has been granted relief under §212(h)(waiver of excludability for certain criminal offenses) or §240A(a)(cancellation of removal for certain permanent residents), or
  (6) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.
8 U.S.C. §1101(a)(13).

[26]INA §212(a); 8 U.S.C. §1182(a).

9

importantly, any alien convicted of committing a crime of moral turpitude will be deemed

inadmissible.[27]  Bank fraud, as a crime involving fraud, is a crime of moral turpitude for purposes

of INA §212(a)(2).[28]

If an immigration officer determines that an arriving alien (including, of course, those

lawful permanent residents transferred to the arriving alien line because they have committed

certain proscribed acts) is not clearly admissible,  the alien is placed into one of two types of

removal proceedings: "expedited removal" or "regular removal".

A person who has no documents, or what appear to be false or invalid documents, is

routed to "secondary inspection" for more extensive questioning as a candidate for expedited

removal.  If the questioning and documentation indicate that the arriving alien should be removed

from this country immediately, the secondary officer can order removal, subject only to a

---

[27]INA §212(a)(2)(A)(i)(I), codified at 8 U.S.C. 1182(a)(2)(A)(i)(I),  provides that certain classes of aliens are ineligible for admission into the United States.
Section 212(a)(2)(A)(i)(I) of the INA provides:
> (a) **Classes of aliens ineligible for visas or admission**
> Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:
>
> • • •
>
> (2) **Criminal and related grounds**
> (A) Conviction of certain crimes
> (i) In general
> Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of–
> (I) **a crime involving moral turpitude** (other than a purely political offense) or an attempt or conspiracy to commit such a crime
>
> • • •
>
> is inadmissible.
8 U.S.C. 1182(a)(2)(A)(i)(I).

[28]8 U.S.C. §1182(a)(2). See, U.S. v. Youboty, 2000 WL 962832, No. Civ. A. 99-4686 at *5 n.1 (E.D. Pa. June 30, 2000)(citing Jordan v. DeGeorge, 341 U.S. 223, 227-228 (1995)).

supervisor's approval.  This is expedited removal.[29]  Expedited removal means that travelers who arrive at United States airports encounter INS officers who can literally put them on the next plane out of the United States or detain them until such removal.

Those arriving aliens not subject to expedited removal are placed in removal proceedings before an immigration judge ("regular removal").[30]  Under INS regulations, verified lawful permanent residents are never subject to expedited removal.  See, 8 C.F.R. § 235.3(b)(5)(ii).[31]

---

[29]The Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") of 1996, instituted new expedited removal proceedings for persons who have arrived at a port of entry and are clearly inadmissible. INA §212;  8 U.S.C. §1182.  Under the new expedited removal procedures, an immigration officer may order expedited removal "without further hearing or review" for persons the officer determines are aliens, and are interdicted, or who arrive at the port of entry with false documents or no documents as defined in INA § 212(a)(6)(c), (a)(7), codified at 8 U.S.C.  §1182(a)(6)(C), (a)(7).  A person whose inadmissibility is being determined under expedited removal proceedings or who is ordered removed under expedited removal "shall be detained." 8 C.F.R.  §235.3(b)2)(iii).

[30]INA §§240, 240a, codified at 8 U.S.C. §§1229, 1229a, provide the procedures governing regular removal.

[31]**8 C.F.R. §235.3(b)(5)(ii) Verified lawful permanent residents**
If the claim to lawful permanent residency is verified, and such status has not been terminated in exclusion, deportation, or removal proceedings, the examining immigration officer shall not order the alien removed pursuant to §235(b)(1) of the Act.  The examining immigration officer will determine in accordance with §101(a)(13)(C) of the Act whether the alien is considered to be making an application for admission...If the alien appears to be inadmissible, the immigration officer may initiate proceedings against the alien under § 240 of the Act (codified at 8 USC § 1229a).  Where an individual claims to be a lawful permanent resident, the INS will attempt to verify such claim.  Lawful permanent residents whose claims are verified may be admitted into the United States or, if considered inadmissible, referred for immigration judge proceedings under INA § 240; 8 U.S.C. §1229a.

Lawful permanent residents also cannot be placed in expedited removal because aliens cannot be placed into expedited removal proceedings unless they are clearly inadmissible. Clearly inadmissible persons have obtained false entry documentation or are not in possession of entry documentation and have committed a proscribed act making them inadmissible.  Lawful permanent residents have verifiable entry documents ("green cards") which prevents them from

They are placed in regular removal proceedings before an immigration judge.[32]

Furthermore, two sets of removal grounds exist: inadmissibility and deportability.[33]  Any alien can be "removed" because he or she is ineligible for admission to the United States ("inadmissible"), or because he or she has violated the terms of his or her status or committed proscribed acts after having been admitted to the United States ("deportable").[34]  The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 modified several key concepts and procedures for removal of aliens who were placed in removal proceedings on or after April 1, 1997.  IIRIRA renamed "excludability" grounds as "inadmissibility" grounds. "Deportability" grounds retained the same title. Although IIRIRA retained two sets of removal grounds, IIRIRA eliminated the separate proceedings for exclusion and deportation, substituting uniform removal proceedings under INA §240a. [35]  Once an alien is placed in regular removal

---

being deemed clearly inadmissible.  All aliens who are not clearly inadmissible, but are also not clearly admissible, are placed in regular removal proceedings. INA §235(b)(2); 8 U.S.C. §1225(b)(2).

[32]See infra note 36.

[33]See, 8 U.S.C. §§1182(a) (inadmissibility), 1227(a) (deportability).

[34]See, 8 U.S.C. §§1182, 1227.

[35]8 U.S.C. §1229a.  The principal distinction between pre-IIRIRA removal categories and post-IIRIRA removal categories is that, under IIRIRA, aliens who evade inspection when coming into the United States (usually those who sneak across the border) are subject to removal proceedings under grounds of deportation, whereas formerly they would have been placed in deportation proceedings.  This change eliminates the often unworkable reliance on an "entry fiction" which afforded unlawful aliens present in the United States greater protections against deportation than they would have received if apprehended and excluded before entering the country.  Relying on such an "entry fiction," an unlawful resident present in the United States subject to deportation was afforded greater due process protections than a lawful permanent resident apprehended at the border and subject to exclusion.

proceedings, he or she may, at least temporarily, be detained.[36]


III.    How the Immigration and Naturalization Act Procedures Impact Alaka

When Alaka arrived in the international terminal at John F. Kennedy Aiport she

proceeded through Immigration.  As a returning lawful permanent resident, it is reasonable to

assume she was initially directed to the line for citizens, nationals and lawful permanent

residents.  Upon inspection of her credentials, the INS officials discovered Alaka had an

outstanding federal warrant for a probation violation.  This presumably triggered the transfer of

Alaka from the line for citizens and lawful permanent residents to the line for arriving aliens.

Once in the line for arriving aliens, Alaka was subject to inspection.  It was then discovered that

this outstanding bench warrant emanated from a 1992 conviction for bank fraud.[37]

Because the crime of bank fraud is a crime of moral turpitude, once in the arriving alien

line, Alaka was detained as inadmissible.[38]  Thus, as a result of her conviction of a crime of

---

[36]§235(b)(2)(A) provides:
[I]n the case of an alien who is an applicant for admission, if the examining officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien **shall be detained** for a proceeding under § 240."
8 U.S.C. §1225(b)(2)(A).

[37]It should be noted that Alaka became a lawful permanent resident in 1990.  Thereafter, on eight separate occasions between 1992 and 2001, Alaka returned to the United States from abroad without the INS discovering that she had been convicted in the U.S. District Court of Minnesota for a crime of moral turpitude.  It must be assumed that, because she was a permanent resident, she sailed through the line for citizens, nationals and permanent residents without further ado.  Only when there was an actual bench warrant out for her arrest was the INS alerted that something was awry.  At no time before that did the INS have a clue that she had been convicted of a crime of moral turpitude in 1992.  Therefore, she had never previously been detained.

[38]8 U.S.C. §1101(a)(13)(C)(5)  subjects a returning lawful permanent resident to the grounds of inadmissibility if she has a prior criminal conviction for a crime of moral turpitude, even if the alien's departure and return were for a purely lawful purpose.

moral turpitude, the INS classified Alaka as an arriving alien required to apply for admission into the country, despite her status as a lawful permanent resident.

Designated as an inadmissible alien, Alaka then became subject to removal.[39]   Once Alaka became subject to removal it had to be determined whether she was subject to expedited removal or regular removal.  Alaka's status as a lawful permanent resident prevents her from expedited removal.  Therefore, Alaka is subject to regular removal proceedings pursuant to INA § 235(b)(2).[40]   Under INA §235(b)(2)(A)[41], once Alaka was classified as an inadmissible arriving alien subject to removal, the INS was authorized to detain her.

Now that she is being detained, Alaka requests an individualized hearing where she can show that she does not pose a flight risk or danger to the community.  In other words, Alaka claims she is entitled to a hearing to determine if bond is appropriate (what I will call a "bond hearing").[42]

## IV.    Bond

Three recent decisions, one from the United States Supreme Court and two from the

---

[39] INA §212(a), 235(b)(1)(A)(i), 235(b)(2)(A); 8 U.S.C. §§1182(a), 1225 (b)(1)(A)(i), 1225 (b)(2)(A).

[40] 8 U.S.C. §1225(b)(2).

[41] 8 U.S.C.  § 1225(b)(2)(A). See, supra footnote 36 (" the alien **shall be detained** for a proceeding under § 240").

[42] I use the phrase  "bond hearing" to mean an individualized hearing on an alien's risk of flight or danger to the community, as outlined in Patel.  275 F.3d at 312.  Bond is a monetary amount for or condition of release from detention, the purpose of which is to ensure the return of the alien at subsequent proceedings.

Third Circuit Court of Appeals, address the issue of whether a detained alien is entitled to a bond

hearing. In 1999, the Third Circuit dealt with an alien who had received a final order of

exclusion but was still in detention after four years because his native country would not accept

him.[43] Chi Thon Ngo v. INS, 192 F. 3d 390 (3d. Cir. 1999) Despite the fact that Ngo was an

excludable alien rather than a deportable alien,[44] the Third Circuit counseled that "[w]hen

detention is prolonged, special care must be exercised so that confinement does not continue

beyond the time when the original justifications for custody are no longer tenable." Ngo, 192 F.

3d at 398. The Third Circuit held that "measures must be taken to assess the risk of flight and

danger to community on a current basis" and that "grudging and perfunctory review is not

enough to satisfy the due process right to liberty, even for aliens." Id.

In 2001, the Supreme Court examined the constitutionality of indefinite post-removal-

order detention of a former lawful permanent resident alien who had received a final order of

deportation but remained in INS custody pursuant to INA §241(a)(6)[45] because the government

was unable to effectuate the detainee's removal to another country.[46] Zadvydas v. Davis, 533

---

[43]Among the changes brought by IIRIRA was a shift in basic immigration terminology. Previously, "excludable" aliens were those who were ineligible for admission or entry into the United States, even though in reality they were often granted "parole" which allowed them to come into the country. INA § 212; 8 U.S.C. §1182 (1994); Ngo 192 F. 3d at 395.

[44]Excludable aliens were traditionally afforded less constitutional protection than deportable aliens, see, Shaughnessy v United States ex rel. Mezei, 345 U.S. 206, 212 (1953). IIRIRA eliminated the distinction between excludable and deportable aliens in removal proceedings.

[45]8 U.S.C. §1231(a)(6).

[46]See, 8 U.S.C. §1231(a)(6).

U.S. 678 (2001).[47]  The Court construed the statute to limit post-removal-order detention to a period reasonably necessary to bring about the alien's removal, generally no more than six months.  Zadvydas, 533 U.S. at 701.  Recognizing that immigration detention implicates a fundamental liberty interest, the Court stated that a "statute permitting indefinite detention of an alien would raise a serious constitutional problem."  Zadvydas, 533 U.S. at 701.

In Patel v. Zemski, 275 F.3d 299 (3d. Cir. 2001), the Third Circuit interpreted the Supreme Court's holding in Zadvydas and the Third Circuit's holding in Ngo to cover the case of a lawful permanent resident alien who was being detained pursuant to INA §236(c)[48] pending a final removal determination following his conviction of a crime constituting an "aggravated felony."  As a result of his conviction, the INS found Patel subject to mandatory detention under INA §236(c),[49] precluding the right to bond.  Patel filed a writ of habeas corpus contesting his detention.  He claimed that his detention without any opportunity for an individualized determination of his risk of flight or danger to the community violated both his substantive due process and procedural due process rights to be free from restraint of liberty.  Examining Patel's detention in light of the Supreme Court's recent decision in Zadvydas, the Third Circuit held that:

---

[47]Aliens who are subjected to a final order or removal lose their lawful permanent resident status or any other authorized alien status that they held prior to the institution of removal proceedings.  See, 8 C.F.R. §1.1(p)(stating that lawful permanent resident status "terminates upon entry of a final administrative order of exclusion or deportation"); Matter of Gunaydin, 18 I & N Dec. 326 (BIA 1982), aff'd, 742 F. 2d 776 (3d. Cir. 1984); Patel v. Zemski, 275 F. 3d 299, 307(citing Matter of Mendoza -Sandino, Int. Dec. 3426 (BIA 2000))(3d. 2001).  Thus, the aliens in Zadvydas no longer retained their lawful permanent resident status at the time of their post-removal-order detention.

[48]8 U.S.C §1226(c).

[49]8 U.S.C. §1226(c).

"[m]andatory detention of aliens after they have been found subject to removal but who have not yet been ordered removed because they are pursuing their administrative remedies violates their due process rights unless they have been afforded the opportunity for an individualized hearing at which they can show that they do not pose a flight risk or danger to the community."

Patel, 275 F.3d at 314.  See also United States v. Radoncic, 28 Fed. Appx. 113 (3d. Cir. Jan. 4, 2001), *petition for cert. filed*, 70 U.S.L.W. 3642 (U.S. April 4, 2002) (No. 01-1459)(not precedential).

The issue before me is covered by the teachings of Ngo and Zadvydas and controlled by their offspring, Patel.  The comparison of facts in each case is outlined in this chart.

| Zadvydas | Ngo | Patel | Alaka |
| --- | --- | --- | --- |
| Former lawful permanent resident | Not a lawful permanent resident[50] | Remains lawful permanent resident | Remains lawful permanent resident |
| Post-removal order | Post-removal order | Pre-removal order | Pre-removal order |
| Subject to removal because of criminal conviction | Subject to removal because of criminal conviction | Subject to removal because of criminal conviction | Subject to removal because of criminal conviction |
| Admitted into United States.  Detained while present  in US. | Paroled into United States.  Detained while present in US. | Admitted into United States.  Detained while present  in US. | Detained upon arrival in US after return from trip abroad. |

Like Patel, Alaka is a lawful permanent resident in the throes of the regular removal

---

[50]Ngo was a native of Vietnam who was "paroled" into the United States as a refugee in 1982.  Ngo,192 F.3d at 392.  The Attorney General has the disretion to temporarily "parole" alien refugees into the United States.  INA § 212(d)(5)(A), (B)(1994); 8 U.S.C. §1182(d)(5)(A), (B)(1994). The alien's entry into the country, however, is a legal fiction.  In the context of the alien's initial entry, this amounts to permission by the Attorney General for ingress into the country but is not a formal "admission."  INA § 212(d)(5)(A); 8 U.S.C. §1182(d)(5)(A) (1994).  When parole is revoked, the alien reverts to the status of an applicant for admission, whose admissibility is determined in exclusion or the more recent removal proceedings.  INA § 236(1994); 8 U.S.C. §1226 (1994).  Parole in this sense is different from the conventional sense of parole from a term of incarceration.  Parole also has a third usage describing the release from custody of those aliens, such as a Alaka,  who are being held in administrative detention.

process under INA §240a.[51]  Like Patel,  although Alaka has been deemed removable, she has not

yet been ordered removed.  Finally, like Patel, Alaka is being detained pending the outcome of

the removal process because she has a criminal conviction rendering her removable.  But the case

for Alaka receiving a bond hearing is even stronger than that of Patel.  Patel was held pursuant to

the mandatory detention provisions of §236(c) of the Act due to a criminal conviction rendering

him removable. [52]  Alaka is being held pursuant to the detention provisions of §235(b)(2) of the

Act due to a criminal conviction rendering her removable.[53]  Unlike the express language of INA

§236(c) at issue in Patel, where Congress clearly intended the mandatory detention of criminal

aliens during the removal process, nothing in the plain language of INA §235(b)(2) indicates that

Congress authorized mandatory detention without the opportunity for a bond hearing in this case.

INA §235(b)(2) only states that an alien "shall be detained" for a regular removal proceeding

---

[51]8 U.S.C. §1229a.

[52]8 U.S.C. §1226(c).  INA §236(c) states:
(1) Custody.  The Attorney General shall take into custody and alien who –
· · ·
(B)is deportable by reason of having committed an offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
· · ·
(2)Release.  The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides ... that release of the alien is necessary [under the federal witness protection program statute, 18 U.S.C. §3521], and the alien satisfies the Attorney General that the alien will not pose a danger ... and is likely to appear for any scheduled proceeding.
8 U.S.C. §236(c).

[53]8 U.S.C. §1225(b)(2).  §235(b)(2)(A) provides:
[I]n the case of an alien who is an applicant for admission, if the examining officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien **shall be detained** for a proceeding under § 240."
8 U.S.C. §1225(b)(2)(A).

under INA §240a[54].

The only one difference between Alaka and Patel, is that Patel was apprehended in the United States, whereas Alaka was apprehended in the airport after returning from a trip abroad. This distinction is of no consequence.  Once in regular removal proceedings, there is no difference between Alaka and Patel.[55]  Both are entitled to a bond hearing regardless of how they came to be placed in regular removal.  There is no rationale for an alien in regular removal proceedings to be entitled to bond when the ground for removal is deportability, but prohibited bond when the ground for removal is inadmissibility.  As previously explained, once an alien is in removal proceedings, the distinction between deportation and inadmissibility is no longer cognizable under the Act. The Immigration and Naturalization Act now refers to "inadmissible" aliens in the place of "excludable" aliens.  Although there are still separate grounds of "inadmissibility" and "deportability", the former distinction between "exclusion" and

---

[54]8 U.S.C. §1229a

[55]At oral argument, the government argued that
> [Immigration Judge Durling] based his reasoning on the fact that [Alaka] was a lawful permanent resident and his belief about how that was really like Patel. [Judge Durling's] decision is undermined by the fact that he's now decided that Ms. Alaka is no longer a lawful permanent resident... [T]he fact that he no longer thinks that [Alaka] is a lawful permanent resident.... makes the distinction [between inadmissible aliens and inadmissible lawful permanent residents] [ir]relevant. (R. at 24, 26.)

The government's argument seems to be that because Judge Durling later found Alaka had constructively abandoned her status as a lawful permanent resident, she is no longer entitled to the same regular removal protections as Patel and must be treated like those arriving aliens who are not lawful permanent residents, possibly subjecting her to expedited removal.  This argument hinges upon the conclusion that Alaka has already lost her permanent resident status. Alaka, however, does not lose her lawful permanent resident status until removal proceedings are complete.  Thus, once Alaka is placed in removal proceedings, she is entitled to the same protections as Patel.

"deportation" proceedings has been dropped in favor of one procedure, "removal".[56]  Except for

certain inadmissible aliens who are subject to an expedited removal procedure,[57] the amended

Act now uses regular removal proceedings as the general procedure for both inadmissible and

deportable aliens.[58]

The Third Circuit's rationale in Patel is sufficiently broad to encompass those lawful

permanent resident aliens in regular removal proceedings, such as Alaka, who are otherwise

classified as "arriving aliens" under § 101(a)(13)(c) of the Act.[59]  Patel mandates that due

process requires "an individualized inquiry into the reasons for detention." Patel, 275 F.3d at 311

(3rd Cir. 2001).  The Government contends that Alaka already received such an independent

review when she applied for parole.  Due process is not satisfied, however, by rubberstamp

denials of release based on a cursory review of an alien's file.[60]  The District Director of the INS

denied Alaka's request in a letter.  The Director simply ticked boxes stating Alaka presented a

high risk of flight and a threat to the community. The Director also ticked a mysterious third box,

indicating "other" reasons for the decision denying parole.[61]  Under Patel, the right to a bond

---

[56] INA §240a; 8 U.S.C. § 1229a.

[57] INA §§ 235(b), 238; 8 U.S.C.  §§ 1225(b), 1228.

[58] INA §240a(a)(2).(3); 8 U.S.C. §1229a(a)(2), (3).

[59] 8 U.S.C. §1101(a)(13)(c).

[60] See, Ngo 192 F.3d at 398.

[61] The INS may release, i.e "parole," arriving aliens who are applicants for admission pending removal proceedings on a case-by-case basis "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182 (d)(5); 8 C.F.R. §212.5, as modified by 65 Fed. Reg. 82, 254 (2000) (INS officials granted authority to issue parole).  INS regulations specify that the following persons seeking admission generally will be eligible for parole on a case-by-case basis: persons with serious medical conditions, pregnant women, juveniles, witnesses in judicial, administrative, or legislative proceedings; or "aliens whose continued detention is not in the

hearing is constitutionally required.  There is nothing in Patel to suggest that anything less satisfies this requirement.

In Ngo, the Third Circuit granted a bond hearing to a post-removal-order alien who was excluded from the country.  In Zadvydas, the Supreme Court granted a bond hearing to a post-removal-order former lawful permanent resident who was ordered to be deported from this country as a result of their criminal convictions.  Finally, in Patel the Third Circuit held that a lawful permanent resident detained while in regular removal proceedings is entitled to a bond hearing.[62]  The facts in these cases make it clear that Third Circuit jurisprudence requires that a bond hearing be offered to Alaka.  The detention of lawful permanent resident arriving aliens after they have been found subject to removal but who have not yet been ordered removed because they are pursuing their administrative remedies violates their due process rights unless they have been afforded the opportunity for an individualized hearing at which they can show that they do not pose a flight risk or a danger to the community.

---

public interest." 8 C.F.R. § 212.5(a)(b).  Alaka was not granted parole even though at the time she was initially detained she was six months pregnant.

    [62]In the recent non-precedential case of Radoncic v. Zemski, the Third Circuit again granted a bond hearing to an alien found to be deportable but not yet subject to removal because he was pursuing his administrative remedies.  28 Fed. Appx. 113 (3d Cir. 2001).  Most significant, while the alien in Radoncic was apprehended in the United States, the ground for his deportation was entering the country without inspection pursuant to the former Immigration and Naturalization Act §241(a)(1)(B), 8 U.S.C. §1251(a)(1)(B).  Under the amended INA, the alien in Radoncic would be considered an "arriving alien" because he entered the country without undergoing inspection.  Thus, the Third Circuit in Radoncic, in effect, held that arriving aliens who are not even lawful permanent residents are entitled to a bond hearing.  As a lawful permanent resident, Alaka's case is clearly more compelling then than that of Radoncic.

**ORDER**

**AND NOW**, this _____ day of October 2002, upon consideration of the petition for writ of habeas corpus, it is **ORDERED** that:

(1) The Petition for Writ of Habeas Corpus (Docket Entry #1) is **Granted** and remanded to the Immigration Judge for a bond hearing.[63]

---

ANITA B. BRODY, J.

Copies **FAXED** on _____ to:    Copies **MAILED** on _____ to:

---

[63]The government accurately points out that the regulations at 8 C.F.R. §3.19(h)(2)(i)(B) indicate that immigration judges have no jurisdiction over the bond requests of arriving aliens. This regulation, however, can not survive the Third Circuit's ruling in <u>Patel</u>.  <u>See</u>, Judge Durling's Opinion in Alaka's Bond Determination.

22